MINERS NATIONAL BANK OF BUTTE ET AL., APPELLANTS, *v.* COUNTY OF SILVER BOW ET AL., RESPONDENTS.

(Nos. 8349 and 8392.)

(Submitted November 29, 1943. Decided April 14, 1944.)

[148 Pac. (2d) 538.]

32

*Mr. R. F. Gaines,* for Appellants, submitted a brief, and he and *Mr. Albert H. Angstman,* co-counsel, submitted an additional and a reply brief. *Mr. Angstman* argued the cause orally.

*Mr. R. V. Bottomly,* Attorney General, *Mr. I. W. Choate,*

Counsel for the State Board of Equalization, *Mr. Frank J. Roe,* County Attorney for Silver Bow County, and *Mr. P. E. Geagan,* City Attorney for the City of Butte, submitted an original and a supplemental brief; *Mr. Choate* argued the cause orally.

MR. JUSTICE ADAIR delivered the opinion of the court.

Two appeals from two separate judgments rendered by the same court in two separate actions. The parties plaintiff are the same in each action as are the parties defendant. The judgment in each case was for defendants and plaintiffs have appealed. By agreement of the parties the causes were consolidated and submitted together. In each action, The Miners National Bank of Butte, a national bank, and A. J. Lochrie, as a stockholder thereof, plaintiffs, instituted suit against the county of Silver Bow and George O'Brien as its county treasurer and against the city of Butte and Bernard E. Holland as its city treasurer, defendants, seeking to have determined the validity of taxes imposed on said bank. One cause (No. 8349) involved taxes for the year 1939 and the other cause (No. 8392) involved taxes for the year 1937.

The first question arises in connection with the taxation of the real property within the state, owned by the plaintiff national bank.

States and their political subdivisions clearly possess the ■ power to tax the real property of a national bank in common with other real property within the state. (Section 5219, Rev. Statutes of the United States, sec. 548, subdiv. 4, U. S. C. A. Title 12; *McCulloch* v. *State of Maryland,* 4 Wheat, 316, 436, 17 U. S. 316, 436, 4 L. Ed. 579; *People of State of New York ex rel. Williams* v. *Weaver,* 100 U. S. 539, 544, 25 L. Ed. 705.)

The statute requires that such taxes on real property of national banks shall be levied according to a definite percentage of the value of the real estate, and that both the rate and basis of valuation applied to the real estate of a national bank shall be the same as those applied to other real estate within the taxing district similarly situate.

In its statement made and delivered to the county assessor

■ pursuant to section 2066, Revised Codes, the real estate of the plaintiff bank is shown as a banking house and the assessor, *for taxation purposes* for the year 1939, assessed such real estate of the bank at the sum of $105,615.

The bank examiners, however, do not permit the bank to carry its real estate upon its books as an asset *in connection with the transaction of its banking business* at more than $66,372.47.

Hence it is clear that *in connection with its business* and, as is shown by its statement, the sum of $66,372.47 and no more, in value of the bank's real estate is *represented* by its capital stock. Such is the amount of its capital stock *invested* in real estate.

Section 5219, Revised Statutes of the United States, sec. 548, U. S. C. A. Title 12, empowers the states to tax shares of national banks provided the taxing is accomplished without discrimination in favor of competing capital. To effect the essential uniformity in taxing the shares of national banks certain statutes have been enacted. Section 2066, Revised Codes of Montana, requires the bank to make and deliver to the county assessor of the county in which the bank is located a statement setting forth its stockholders, the face value of its capital stock, the amount of its surplus and undivided profits and an estimate of the value at which said stock shall be assessed as of the close of business the day next preceding the first Monday of March, each year.

Section 2000.4, Revised Codes of 1935, as amended by Chapter 34, Laws of 1939, prescribes a uniform method of ascertaining the value of the shares of a national bank for taxation.

The plaintiff bank made and delivered to the assessor of Silver Bow county the required statement of its resources and liabilities as of the first Monday in March, 1939. This statement is required to agree in all essential details with the daily statement record of the bank. The statement shows:

"Resources

| | |
|---|---|
| Loans and discounts taken for future and unearned interest _____$ | 3,788.81 |
| 1. Loans and discounts _____ | 254,942.77 |

| | |
|---|---|
| 2. Overdrafts | 19.72 |
| 3. Bonds, stocks, warrants (includes $237,402.36 of government bonds) | 480,123.01 |
| 4. Banking House | 60,736.82 |
| 5. Furniture and Fixtures | 5,635.65 |
| 6. Expense in excess of earnings | |
| 7. Other real estate (real estate schedule below MUST be filled out) | None |
| 8. Cash on hand | 52,815.76 |
| 9. Due from banks | 479,038.45 |
| 10. Checks and Exchange | 8,884.77 |
| 11. Cash items | 2,764.33 |
| Total | $ 1,348,750.09 |

### Liabilities

| | |
|---|---|
| 12. Capital Stock | $ 100,000.00 |
| 13. Surplus | 16,000.00 |
| 14. Undivided profits | 17,046.87 |
| 15. Deposits, including amounts due to banks | 1,174,566.85 |
| 16. Cashier's checks | 29,295.97 |
| 17. Certified checks | None |
| 18. Dividends unpaid | 420.00 |
| 19. Unearned Interest added to principal of notes | 3,788.81 |
| Reserves—Losses on bonds, etc. | 7,631.59 |
| Total | $ 1,348,750.09" |

It will be noted that in the above statement the plaintiff's banking house is carried at a value of $60,736.82 and the furniture and fixtures at a value of $5,635.65 making a total in such items of $66,372.47. Of course the banking house furniture and fixtures is property which is separately "assessed to said bank."

Section 2000.4, Revised Codes of 1935, provided: "In ascertaining the value of the shares of a national bank for the purpose of taxation there shall be deducted the value of all real estate of said bank, which shall be assessed to said bank."

The above statute was amended by Chapter 34 of the Session Laws of 1939, effective as of February 17, 1939, to read: "In ascertaining the value of the shares of a national bank for the purpose of taxation there shall be deducted the *book* value of all real estate of said bank, which shall be assessed to said bank."

In 1939, the taxing authorities, pursuant to Chapter 34, Session Laws of 1939, supra, in ascertaining the value of the shares of the plaintiff national bank for the purpose of taxation deducted the said sum of $66,372.47 so carried and shown on the bank's statement as an asset and so represented by capital stock of said bank invested therein to the amount of $66,372.47 and no more. It is contended by plaintiffs that the larger figure of $105,615.00, representing the *assessed* value of the real estate, which they claim is the actual or cash value thereof, should have been deducted instead of the lesser sum of $66,372.47 at which the real estate is carried as an asset of the bank and to which amount it is represented by the stocks of the bank.

Article XII of the Constitution of Montana in part provides: "Sec. 16. All property shall be assessed in the manner prescribed by law except as is otherwise provided in this constitution. * * * Sec. 17. The word property as used in this article is hereby declared to include moneys, credits, bonds, stocks, franchises and all matters and things (real, personal and mixed) capable of private ownership, but this shall not be construed so as to authorize the taxation of the stocks of any company or corporation *when the property of such company or corporation represented by such stocks* is within the state and has been taxed." (Emphasis ours.)

In *Daly Bank & Trust Co.* v. *Board of Commissioners of Silver Bow County,* 33 Mont. 101, 81 Pac. 950, 952, this court, in interpreting section 17 of Article XII of the Constitution, supra, said:

"The meaning of this last section is clear: *To the extent that the capital stock is represented* by property belonging to the state bank or trust company, and which property is liable to taxation, to that extent the stock of that bank or trust com-

pany is not taxable. * * * Stocks of a state bank or trust company fall within the definition of the term 'property' as given in section 17 of Article XII of the Constitution, above, * * * and are to be assessed to the owners at their full cash value, *except to the extent that that value is represented in property which is assessed to the bank or trust company.* (Sec. 17, Art. XII above.) * * * The result of our deliberation is that * * * the stock is taxable to the owners at its full cash value less the amount of taxable property of the bank or trust company representing such stock.'' (Emphasis ours.)

In the instant case *the extent* to which the stocks of the plaintiff bank *is represented* in real property which is ''assessed to said bank,'' is simply $66,372.47 being the value at which the bank carries, and the maximum value at which it is permitted to carry, such real estate on its books as an asset *in the transacting of its banking business.* In other words, $66,372.47 reflects the maximum amount, the maximum value and *the extent* to which the bank's real estate is or may lawfully be carried as an asset. To that amount, value and extent this real property which is assessed to the bank and on which it pays taxes, is represented by capital stock of the bank. To such extent and value and no more is the bank entitled to a deduction for real estate owned by it within the state and represented by its capital stock. Such value represents the total amount, in terms of its capital stock, that the bank has *invested* in real estate within the state which is the sum it is entitled, under the statute, to deduct. In *Dennis* v. *First National Bank of Great Falls,* 55 Mont. 448, 458, 178 Pac. 580, 582, this court held Chapter 31, Laws of 1915, invalid, insofar as it provided that the *assessed* valuation of the bank's real estate should be deducted, saying: ''The provisions of the Constitution are mandatory, and in this instance required that the total amount *invested* in real estate within the state be deducted from the total of the capital stock, surplus, and undivided profits.'' (Emphasis ours.)

The plaintiff bank was and is permitted to place as low a value as it sees fit on its banking house. It could carry its

banking house in its statement and on its books at a value of but One Dollar if it chose and, such in times past, has been done by various banking institutions. However, the law very wisely bestows upon the Comptroller of the Currency the authority to place a maximum value at which the banking house and real estate of national banks may be carried as an asset in transacting its banking business and such amount is here shown on the bank's books. It is the policy of the law that no greater amount of the capital stock of the bank shall be represented by the bank's non-liquid real estate holdings than the figure so determined upon by the bank examiner under the law. If, in making the deductions to offset the taxed real estate represented by the capital stock, any other or different figure is used, then uniformity in the taxing of state and national banks will be at an end and discrimination is bound to result. In the instant case, the state may not tax the bank's real estate for $66,372.47 and, at the same time and additionally tax the $66,-372.47 worth of capital stock represented by such real estate. However, the state may and it does tax the real estate to the extent it is not represented by the stocks of the bank and to the extent that it has a value above and beyond the book value of $66,372.47. The state having assessed the value of the bank's real estate at $105,615, the taxing authorities, in ascertaining the value of the shares of the bank for the purpose of taxation are directed to deduct the exact part and portion of that sum that is represented by capital stock of the bank and no more. As a matter of bookkeeping, if the bank were permitted to deduct the assessed value of its real estate in the sum of $105,615, then to balance its accounts and statements it would be required to add to its capital stock, undivided profits and surplus $39,242.53 representing the difference between the figure at which it carries its real estate on its books as an asset *for banking purposes* and the figure at which the county assessor carried same on his books *for taxation purposes*. In our opinion, there is nothing in Chapter 34 of the Session Laws of 1939 that in any way conflicts

with section 17 of Article XII of the Constitution of this state, and the same is a valid legislative enactment.

While *"book* value" appears for the first time in Chapter 34 of the Session Laws of 1939, yet this only makes more specific section 2000.4, Revised Codes of 1935, under which the taxing authorities were authorized to deduct only the amount or value of the bank's real estate shown to be represented by capital stock of the bank, and we find nothing improper in the deductions made by the taxing authorities for the year 1937 with respect to the bank's real estate.

The total amount of "loans and discounts" of plaintiff bank, ██ as set up on the bank's books on the first Monday in March, 1939, was $258,731.58. This asset the bank has attempted to subdivide and reclassify by setting up $3,788.81 as representing unearned and uncollected interest which sum is reflected in the face amount of installment or long term notes owned by the plaintiff bank. This sum of $3,788.81 the bank sought to segregate and deduct from the total of its "loans and discounts", thereby reducing their aggregate amount as a bank asset from $258,731.58 to $254,942.77. The bank contends that since there was no fixed liability on the part of the makers of some of the notes to pay such unearned and uncollected interest, such notes, if liquidated on the day following the first Monday in March, would have produced $3,788.81 less money for the bank, and for such reasons that it was arbitrary conduct for the assessor to include such sum of $3,788.81 in computing the total of the bank's capital stock, surplus and undivided profits. It is stipulated that in conducting its banking business and in keeping its books the plaintiff bank followed an approved system of accounting in general use within the state of Montana. It appears that the bank included among its assets and as part of its loans and discounts, $3,788.81 in interest which had neither been earned nor collected. "Loans and discounts" are a part of the bank's "moneys and credits" and such may not be classified either as money borrowed for carrying on the business of the bank nor may such items be called deposits. It must be constantly kept

in mind that the assessment of all banks, state and national, must be made on the same basis and that such assessments must be kept uniform. In assessing a state bank the "moneys and credits" are added and deductions are then made of the deposits and of any money borrowed for carrying on the business of the bank. However, no deductions are allowed or taken for any reserve for "unearned interest." It would be discrimination to allow national banks to deduct for items of unearned interest and for which notes have been given and are held by the bank as an asset and to deny to state banks such deductions. When the books are kept on a cash basis, no interest is shown as an asset until such interest is reduced to cash and collected. As to interest collected but not earned, the bank simply adds such items to its "undivided profits" while it deducts all items of interest earned but not collected. In arriving at the value of the bank's stock for taxation purposes, the taxing authorities therefore reduce the items shown in the statement furnished by the bank to a cash basis, regardless of whether or not the bank keeps its book on such cash basis.

Plaintiffs contend that the effect of the assessor's refusal to permit the deduction of $3,788.81 representing unearned interest was to say arbitrarily that on the first Monday in March, 1939, the loans and discounts of the plaintiff bank had a value of $3,788.81 in excess of the valuation placed upon them by the bank. Such aggregate amount, however, appears on the face or principal amount of the notes and not as a separate item of interest, and it appears that the bank claimed and set up on its books and in its statement, as an asset, the full face value of such notes which includes the $3,788.81 which the bank says represents interest not yet earned. The bank having shown on its books, as an asset, the actual face amounts of all the long term installment notes when it came to determining the value of the plaintiff bank's stock for taxation purposes, the taxing authorities also considered such long term installment notes at their respective face amounts as an asset and as part of the bank's loans and discounts. We see nothing improper in this.

In reducing the bank's statement to a cash basis, the bank is justified in adding to its ledger balance including current earnings such items as interest accrued but not paid, expense accrued but not paid and interest collected but not earned and from such total it may then subtract or deduct the total of interest earned but not collected as of the return day and the balance remaining is shown as "undivided profits." It would appear that here the plaintiff bank seeks to have the assessor take into account the items representing interest collected but not earned in the aggregate amount of $3,788.81 without accounting for the items representing interest earned but not collected on its loans and discounts as of the return day. This the assessor may not do. To reduce the statement to a cash basis and to show the undivided profits of the bank on a cash basis, the items of interest earned but not collected as well as the items of interest collected but not earned must be shown. In failing to show either in its pleadings or in the agreed statement of facts that such course was followed by the bank, the appellants failed to plead or prove anything improper or illegal in the assessment made by the taxing authorities.

Under "Liabilities" in its statement to the assessor is an item listed as "Reserves—Losses on bonds, etc. $7,631.59." Under "Resources" in the statement is an item listed as "Bonds, stocks, warrants (includes $237,401.36 of government bonds) $480,123.01." The agreed statement shows that the bonds, stocks and items which made up the aggregate total of $480,123.01 varied and fluctuated from day to day and that under the said system of accounting used by the bank "it was not permitted to attempt to determine and offset such appreciation in value against or to equalize depreciation in value in other items within the same group or classification. That further under such system of accounting it was usually and customarily required that periodically in the determination of the market value of the entire group of items of such classification, the amount of such reasonable market value was required either to be reduced by the difference between the cost price and the then market

value or to establish a reserve in some determined amount sufficient within the bounds of reasonable contemplation to protect the bank, its stockholders and depositors against loss with respect to particular and specific items within such general groups of items. That as of the return day aforesaid plaintiff did have in its possession and ownership as a part of its assets, bonds, the market value whereof was less than their cost price to the plaintiff bank and to a total extent in excess of said sum of $7,631.59 and that such items were in part those as shown in the sheet or schedule Exhibit A-4, and that the schedule Exhibit A-4 was furnished at the request of the taxing authorities of the County of Silver Bow and State of Montana. That it was not intended to be and was not a complete list of bonds owned by plaintiff bank, but was furnished as supporting evidence of the propriety of a reserve being set up in connection with the entire item of 'bonds, stocks, warrants.' That the amount of the item 'Reserve—Losses on Bonds, etc., $7,631.59' was not given as representing nor intended to represent an actual loss sustained but was made for the purpose as above set forth and if, on the return day the books of plaintiff bank had not contained the entry last mentioned the amount for which plaintiff bank would have been permitted to carry the item 'Bonds, stocks, warrants, etc.' and should have carried such item as an asset on its books in conformity with the above mentioned method of accounting, would have been a sum at least $9,595.00 less than the aforesaid sum of $480,123.01. That the amount of the aforesaid reserve was not determined with respect to nor at all in contemplation of appreciation in valuation of other bonds, although as of said return day plaintiff bank did own some bonds then unsold, which did show a substantial appreciation in value as determined by the difference between the cost to plaintiff bank and market value, as disclosed by stock market reports on said return day.''

The foregoing facts, being insufficient accurately to reveal the true value and worth of the entire bond account, do not justify the setting up of the sum of $7,631.59 as a reserve for

bond losses, nor do they disclose that the bond account of $480,123.01, when considered in the aggregate and as a whole, showed an actual reduction in value in the sum of $7,631.59 or of any other amount. While a partial list of a few of the bank's bonds and stocks did show that on the first Monday in March, 1939, such particular bonds and stocks were worth less on the market than when purchased, yet plaintiffs do not attempt to assert that such was the case with the great bulk of the bonds and stocks that went to make up the $480,123.01. Admittedly the reserve so set up for bond losses is inaccurate, incomplete and based upon conjecture, guesswork and anticipation rather than upon any facts or figures showing that on the market as of the return day the bonds and stocks were not then worth, on the market, $480,123.01. It is as reasonable to surmise that the whole bond account on the return day was worth more than the total shown on the statement, as it is to guess that the account would show a loss. The one way to determine is to list *all* of the bonds and ascertain their market value, rather than select only a few of the weak ones from the list. The taxing authorities are entitled to know whether or not the whole list shows appreciation, or whether the whole lot shows depreciation, and, if the entire account shows depreciation, the exact amount thereof before they are warranted in allowing a reduction in value as of the first Monday in March for anticipated bond losses that may never be sustained. The $7,631.59 which the bank attempted to set up as a reserve for anticipated bond losses was taken from the bank's undivided profits. A bank may not thus withhold from assessment a part of its undivided profits by setting same up as a reserve to make good possible or antipated losses on its bonds and stocks which losses may never occur. (8 Michie Banks and Banking, sec. 39E, p. 235; *Bank of Arizona* v. *Howe,* D. C., 293 Fed. 600.)

Under the facts shown herein the taxing authorities were justified when ascertaining the value of the bank's stock for taxation purposes, in placing the so-called "reserve for bond losses" right back in the bank's "undivided profits" where it rightfully

belongs. We find no error on either appeal and judgment in each cause (Nos. 8349 and 8392) is affirmed.

ASSOCIATE JUSTICES ERICKSON and ANDERSON concur.

MR. JUSTICE MORRIS:

I concur in part and dissent in part. I concur in the result arrived at as to the first question dealt with in JUSTICE ADAIR's opinion, that is, the question relative to arriving at the value at which the banking house of the plaintiff, for the purposes of taxation, shall be fixed; and I dissent as to the item of $3,788.81 mentioned in the statement set out in the opinion. The item, appearing as both a resource and a liability, is a peculiar mode of bookkeeping, and confusing to some extent. As a resource it should be included in the item of "Loans & Discounts," for the reason that the loans and discounts contain certain loans included in that item whereon interest runs from maturity of the particular loan and the interest on such loans will not be earned until the future due date of such loans arrives. It is not an asset that has been collected, may never be collected, and is improperly listed in the assessments.

As to the third and last question dealt with in the opinion of JUSTICE ADAIR, I dissent and think the evidence in the record is not sufficient to warrant the conclusion arrived at, and the action as to that question should be remanded for further proceedings. Irrespective of the par value or alleged value of bonds and similar securities, the actual value of each item should be determined as nearly as possible as of the first Monday in March of the taxable year.

MR. CHIEF JUSTICE JOHNSON:

I concur in the result, but not in all that is said in the above decision. I disagree with the comments upon and the criticism of the plaintiff bank's methods of accounting, which in my opinion are neither correct nor within either the issues or this court's jurisdiction.

The sole question is the value of the capital stock of the bank on the first Monday in March, as represented by the value on that day of the bank's property exclusive of the real property,

which is otherwise taxed. It seems obvious that if the item representing the real estate is stricken from the balance sheet showing all the assets, the real estate is completely eliminated so as to prevent double taxation. This is so, whether or not the balance sheet item is less or greater than the true or assessed value of the real estate.

The second point does not, as implied in the first opinion, involve the propriety of a "reserve for unearned interest;" it merely involves $3,788.81 of interest not accrued on the first Monday in March but included in the stated face value of notes representing "loans and discounts." Since that amount was then nonexistent as value the plaintiffs were entitled to have it deducted. However, the remaining $254,942.77 face value of notes contains no item representing the interest then actually accrued upon the notes and uncollected. Presumably on few was the interest paid to exactly the first Monday in March; their value as of that date actually exceeded their face value to the extent of the interest then accrued and unpaid. Three months' interest at the rate of six per cent. per annum on that amount would exceed the $3,788.81 sought to be deducted for interest included but not accrued; it is perhaps improbable that so much interest was accrued and unpaid upon that date, but neither the assessor nor this court has any way of ascertaining whether or to what extent it might offset the $3,788.81 deduction claimed. Consequently the plaintiffs have not shown that the notes were overvalued to that, or any, extent, and the assessment cannot be held erroneous.

Somewhat the same situation exists with reference to the third contention. Instead of attempting to revalue all the bonds to show their exact value on the first Monday in March, an account was set up which was intended to represent the reduction in value of all the bonds below the figure at which they were carried on the books. If all the bonds were on that date worth $7,631.59 less than the book value, that amount should have been deducted from the $480,123.01. The portion of the agreed statement of facts quoted in the first opinion above

would indicate that all the bonds were then actually worth $9,595 less than that figure, and if so, the plaintiffs would be entitled to prevail upon this point. But further reference to the evidence shows that the $9,595 represents the reduction in value of only a few of the bonds. Since the stipulation shows that some of the bank's bonds showed a substantial appreciation over the balance sheet valuation as of that day, the showing obviously falls short of proving that the bonds as a whole were then worth $7,631.59 less than the value at which they appear in the balance sheet.

The last fifteen lines of the first opinion exemplify my chief objection that the opinion improperly, as well as incorrectly, volunteers an adjudication of accounting questions not before us nor within our jurisdiction. Most reserves for anticipated losses are made to cover losses which may never occur. But it obviously does not follow that the reserve is therefore improper; in fact conservative accounting practice requires that it be made. But whether the loss ever actually occurs does not here concern either the courts or the taxing authorities. We are concerned only with the value of the property on the first Monday in March; whether the value went up or down after that date and before sale by the bank is entirely immaterial in fixing the value on that date.

I concur in the result.

Rehearing denied May 18, 1944.